Good morning. My name is John Lambrose. I'm here on behalf of Mr. Ricky Major, the petitioner in the appellant below. I'd like to begin my argument with what the Court certified last week, the claim that obviously we have We didn't certify anything. You just asked for it. I misspoke. The Court invited counsel to discuss during today's argument the juror misconduct or, excuse me, extrinsic contact, what I call the poisoning of the juror claim. Obviously, I'd like to talk about that just because the standard of review is much more deferential to Mr. Major, and we briefed why that is, because if you review the record, both the State Trial Court and the Nevada Supreme Court did not employ the Umatics remor, and in this case, the Ninth Circuit's Caliendo v. Warden test, which is once the contact has been presented to the Court, and in this case, Juror Winder, after having heard 29 prosecution witnesses in 4 days of evidence, advised the Court that the day before, a friend of a friend of her mother had contacted, had told her at work that they found the knife, they found the murder weapon, and it's the weapon. And then later on, and, you know, I don't want to – Did she actually say they found the weapon? What she said at excerpts of record 896 and 897 is, well, my mother has a friend of a friend that found the knife, and they found out that it was the knife, and it was the best damn knife they used, and they got rid of it. So she says that, and then later on, after the conclusion of the evidence, defense counsel asks one more time to have Juror Winder examined. Right. And Juror Winder said at that point that it was, yes, a fellow employee, that the fellow employee knew she was a juror in the Rickey-Major case, and that what she said this time was, I knew that this was at excerpts 948, she said, well, you know that murder case, how did she put it? You know, my mom has a friend of a friend, you know, which I was – I never take anything serious from anybody over there. They found this knife, and she assumed that it was the murder weapon. It would be an open and shut case if they had that knife. And then – and then Juror Winder went on and said, but, you know, I don't necessarily believe this stuff. No, I don't necessarily. I don't. I mean, that's – the real question here is whether the government overcame any presumption of prejudice, given the fact that this woman said, I don't believe – as I understood it, I don't believe a word this woman says, so I'm certainly not going to believe anything – it's not going to influence me at all, because I know she's a liar. That's what I understood her to say. And if – obviously, if – if rules matter, and I'm certain that they obviously do, and this rule is more beneficial to the Petitioner, that doesn't happen very often in a habeas corpus case. But what this Court said in Caliendo, at page 69 was – at 699, just to make it clear here, 365, Fed 3rd, 699, Extrinsic contact may be substantial, even though not perceived to be by the juror, and the juror's, quote, unquote, good faith cannot counter this effect. So even though Juror Winder could have professed to high heaven that this had no effect on her, the fact that it happened is what the Court is concerned about, is what this Court should be concerned about, is what the United States Supreme Court is concerned about in all of these extrinsic poisoning of the juror cases. This case is compelling because what we have is discussion about the murder knife after 29 witnesses have testified. It – juror – or, excuse me, witness Brockett, at excerpts of record 450 to 458 was the witness who said she found knives and gave them to the police officers. Now, admittedly, every police officer that testified after her said, I never got any knives from her. Okay, well, one inference that I can draw from that, and obviously I'm a little biased because I represent Mr. Major, is that maybe the jurors might have thought, or this particular juror, Juror Winder, because there's no evidence that she said anything to any of her fellow jurors, she might have been thinking, well, you know, it's a small town, maybe Mr. Major got that knife suppressed and they really did find the murder weapon. And if that's the case, it's an open and shut case. So, you know, to me, that's one inference. I'm not saying that that happened. I'm just saying, you know, if we're going to speculate that Juror Winder can be truthful about the fact that this had no effect on her, then, you know, the other side of that record is maybe she wasn't being completely candid. The most compelling evidence about knives, obviously, came from the forensic anthropologist, Sheila Brooks. She said that there was multiple trauma wounds throughout the bones that she was able to examine that were sharp instrument-induced. Now, she was not qualified to give an opinion as to the cause of death, but the very next witness that testified, the medical examiner, Ellen Clark, at Excerpts 591 through 604, testified that because of what Dr. Brooks said, and to a more limited extent to what Dr. Burkby had said, she conveys her opinion beyond to a reasonable medical certainty that the cause of death was a knife wound. So there was criminal agency. So there we have more discussion about knives. Finally, Mark, there was evidence both from Gary Worthen, a friend of Mr. Major. It's Excerpts at 744, and then a police officer, Excerpts at 872, that Mr. Major had had a knife in his kitchen that was no longer in his kitchen, and that the victim had kept a very tidy kitchen, and there was no explanation for this missing knife. The juror, Winder, was told was that the --- The interesting thing about the comment she reported was that if they had the knife, it would be an open-and-shut case, but she didn't say in what direction. I'm sorry? She said what she was told was if they had the knife, it would be an open-and-shut case. Right. But she didn't say in what direction. Well, obviously, it was -- obviously, to me, anyway, it would be an open-and-shut case against Mr. Major, because that was the knife. That was the knife that was missing. That was the knife that Brockett says she gave to the police. It could be that it was -- if they had the knife, they know it wasn't Mr. Major's. Well, if it was a knife that was going to exonerate him, if it was a knife that was exculpatory, then Mr. Major's lawyer would have been presenting that knife. What happened -- But there even was a knife. This was just a statement by somebody. Didn't one of the officers say they'd never even -- they were surprised to hear about the knife? The district attorney was surprised to hear about the knife. That was the substance of an issue that was not certified also, the Brady claim. I'm not, you know, I'm not -- I don't mean to suggest that there was any kind of skullduggery here, but what I'm saying is, again, if there -- So explain to me a little bit, what exactly did the trial court judge do wrong? Well, what the trial court judge did- He conducted a hearing, right? He did precisely what the trial court judge- He allowed cross-examination. He allowed examination, cross-examination. When counsel asked to examine her again, he allowed that. Right. The witness made the statement, explained her position, as Judge Berzon just reiterated to us. Well, what he didn't do is he didn't- So he heard her say, you know, I'm not -- it's not going to influence me, essentially, is what she said. Right. But what he didn't do is, in fact, he did the exact opposite. He didn't start with the threshold question, and that is, Mr. District Attorney, there is a presumption of prejudice here because of this contact. It's not de minimis. You now must rebut it, and here's the standard.  Well, he certainly expressed concern about it. But he did not- He asked them to inquire. Well, they inquired, and ironically, or ironically, it's not even ironic. It's comical. The District Attorney said on the record, she's -- I'm okay with this witness. She's fine with me. Now, that's not even anywhere near what the standard is. The District Attorney has not -- he has -- whether or not he's happy with the witness is completely irrelevant to the- Well, consider what the judge did. Well, the judge didn't even start with the correct- Well, but at the end of it, at the end, what did he have at the end? What did the judge have at the end? Yes. What was he dealing with? He was dealing with a juror that should not have been able to deliberate. In light of her responses? In light of her responses, in light of the fact that the State was unable to show that prejudice was not rebutted, the possibility of prejudice, that's what's so compelling here, and I know I'm- Prejudice rebutted by the witness saying, I won't pay any attention to that. I don't really believe that person anyway. Well, again, I think I answered- Couldn't a reasonable person, the trial judge, have said, well, that, in his own mind, that rebuts the presumption? Well, I think if that's the rationale for- Does he have to articulate that? Is there a constitutional requirement that he has to call out the existence of the presumption, state it to the defense attorney, tell him that he's ahead, tell the district attorney that he's behind, have the district attorney make a proof, and then articulate how he is convinced that the presumption is rebutted? Is all of that required? Well, I think so. I mean, that's- Do you have a case that says that? This Court said that in Caliendo. If you look at the way this Court analyzed the case in Caliendo, Judge Hall was very clear that the court of appeal did not identify or apply the clearly established Maddox rule. The Court relied on the Supreme Court's decision, and just like the Nevada Supreme Court, they didn't rely on the correct standard. So what this panel did is they did call out the California state courts. They said, you did it wrong, and now we're going to have to conduct independent de novo review.   And they said, you did it wrong, and now we're going to have to conduct independent de novo review. Well, they're telling that the court of the – well, I guess I'm just more concerned about the trial, what the trial court judge was confronted with at the time, all this was happening. Well, it's one thing for the court of appeal not to have applied the correct analysis. Right. But so you're – so the judge is sitting there. Does he have to say – I think what Judge – what Judge Beyer was saying, does he have to say, Mr. DA, you're right, this is all happening as this trial is unfolding. Does he have to say, Mr. DA, given what happened here, there's a presumption that she's not qualified to serve as a juror anymore. Tell – you know, let's go through and figure out what is – can you rebut the presumption that that's not going to affect her decision? And so, again, all I have to go on is what is precedent. And luckily, precedent's on my side in this case, because I can't read Caliendo any other way. Is it your position that the State trial court and appellate court applied the right or the wrong standard? I mean, did they apply the right prejudice standard? The – they applied the incorrect prejudice standard. And that's evident from what the trial court did vis-à-vis Caliendo. And then if you look at excerpts of the trial court.   And that's a very compelling piece of evidence. And that's because they didn't apply – they didn't switch the burden and put a heavy burden on the – Yes. Right. And how do we know that? Yeah. And then – and then we'll see. But how do we know that? I mean, from what – where do you get that from? Well, because I think one – one compelling piece of evidence is the fact that the judge was very happy with the fact that the district attorney was satisfied with this witness. And the district attorney says that at the – Do we have any direct articulation of what standard was being applied? No, we don't. Not at either? There was no citation to Renner or any of the other Supreme Court judges. No. But there was – Because these things are just unfolding as they happen. And the trial court judge is just trying to deal with the situation, which was a serious one. There's no question about it. Whenever – whenever there's contact with a juror, extraneous contact with a juror, it's serious. And you have to take it and you have to look at it and decide. Right. Right. Whether there's – whether, you know, there's a need for a mistrial. I agree. And it doesn't excuse the fact that, you know, that the wrong standard was applied. But it was exacerbated by the fact that the Nevada Supreme Court, if you look at excerpts at 129, they identified the standard, Renner in a parenthetical, as holding that the remedy for allegations of juror partiality is hearing in which defendant can prove actual bias. Let me ask you this. No, wait a minute. But they did cite Renner for that. They did cite Renner. They cite Renner, but that's not the rule in Renner. But they later say they later cite a Nevada case which says that there – which assumes a presumption of prejudice and then say – I'm sorry? They do that. They cite the Isgall case. They put the correct parenthetical, and then when they do the analysis, what they say is that Renner requires the defendant to prove actual bias. That's not true. The way the analysis works is we have the threshold showing to show that it's not de minimis. We did that because it's about a knife. And then the burden shifts to the State, and the State has the burden to show that there was no possibility of prejudice. No. The State has the burden of presenting evidence to show that. But the burden of proof to show bias always remains with the defendant, right? Well, I think the – There's a difference between the burden of persuasion and the burden of presentation of evidence. I agree with you that the presumption requires the defendant – pardon me, the prosecution to come up with evidence to rebut the presumption. But the burden of persuasion stays with the defendant to show bias. To show that there was prejudice, to show that there was a possibility of prejudice. Right. So I'm – Yeah. And I'm saying that the State never did carry the day. Right. I agree with that. Let me just ask one other question on this. Assuming that you're right, I mean, there was a constitutional violation here for purposes of habeas relief. Is the prejudice standard built into Renner, or do we then overlay that with the Brecht analysis? Well, you know, that's a very good question, and quite frankly, you didn't do it in Caliendo. You did not do it in Caliendo. Now, in a case that I – a case that follows Caliendo, this case called Fields – I have the site here, but it was never briefed – there was some suggestion in – actually in Judge Berzon's dissent in that opinion that that might be a possibility. But that – as far as – as far as the law in this circuit is concerned, Brecht is not even part of the – part of the analysis. Judge Hall and the panel that decided this case, which is still the law because Fields did not – Fields did not overrule this case, is still that, you know, an independent de novo review with the Renner standard is not at all tainted by AEDPA. Again, that's good for us. But it's not at all logical, given everything that happened after that, right? Well, it's – you know, I mean, I think it's – until it gets reversed, that's the – that's binding logic. What about – there's a case that nobody cited called United States v. Rosenthal, which tries to lay out the standards for no one because the States never even briefed this for good – I mean, correctly. But which – which says that where ex parte communication is involved, the district court, upon finding a reasonable possibility of prejudice, must hold a fair hearing. But then it says extraneous information cases, which is what this appears to be, call for a more searching review. We grant a new trial if there is a reasonable possibility that the material could have affected the verdict. And we place the burden on the party opposing a new trial to demonstrate the absence of prejudice. So that seems to be something different than what Judge Beyer was suggesting when you were agreeing to. Well – So what is it? I mean, what exactly is the role? What I thought I was agreeing to with Judge Beyer's question was that the defense always has the burden to show that it's more than de minimis, that the extraneous contact – I assume we have general agreement that that's true here. Then that's it. Then once – once we've shown that, if the State cannot rebut that with evidence showing that there's no possibility that it was prejudicial – Well, no, not a reasonable possibility. Excuse me. I'm sorry. A reasonable possibility that it was prejudicial. In other words, not probability, which we – you know, which we are always – that's more likely than not. A possibility is – you know, that's pretty deferential to Mr. Major again. And again, just so I'm clear, I didn't mean to agree with – to concede something here, that, you know, it's my argument that once we make that beyond de minimis showing, which has been made, was talking about the knife, the murder weapon, then the State has to rebut. If they don't – if they don't rebut. All you're saying is that her statement is insufficient to rebut, is not enough to rebut. Absolutely. You said that in Caliendo. All right. Let's see. We'll – Just one other thing. I mean, her statement, though, was more than it's not going to influence me. It was – it's not going to influence me because this person is a liar and I don't believe anything she says. No, she didn't say that. Now, what is that different? She didn't say that. Well, she came pretty close to saying it. I don't think she said that. Maybe trust me or something. She didn't just say, you know, I'm going to be able to put this out of my mind. She said, I don't believe this person in general. Well, I don't think she said that. I'm looking at what she said. She – she said that the – Well, let's suppose she did say it. Would that matter? Yeah. You know, it's in the record. What – I agree that – that she, you know, said – She was – do you believe this person – what this person said? Answer it. With Rebecca, no. You never know what to believe or not to believe. Okay. Well, you know, she might have been trying to – yeah, it's just as reasonable for somebody like me to think that she was trying to distance herself so she could really nail Mr. Major when she went to retire. Of course, she wasn't going to do that. She never would have come forward to begin with. I mean, that's – that's really the good faith here, right? She didn't even have to say word one. Well, who knows? Because, you know, somebody like me might have ferreted this information out later on. She might have been trying to cover herself. I mean, if we're going to speculate, I'm happy to speculate. I don't really know where the law is. Let's hear from the State. Okay. Thank you very much. I appreciate the opportunity to be able to talk about this issue. May it please the Court and counsel, my name is Robert Whelan. I'm a senior deputy attorney general employed by the Office of the Attorney General of the State of Nevada. I have the privilege of representing the Respondents in this matter. In the first instance, I would like to interpose an objection because this Court doesn't have jurisdiction over this issue in the first instance. Of course, a certificate of appealability, as Judge Berzon noted, has not been issued in this. All right. But we asked you to address the question of whether we should issue a certificate of appealability, which obviously morphs into the merits. And frankly, I mean, given the degree of discussion we've had, it seems likely that it's at least colorable enough to have a COA, but that's what we want you to address. Okay. Well, the fact that this Court did not issue a certificate of appealability when it issued its order indicates that he didn't satisfy his burden in the first instance. Don't draw any inferences one way or another. It only takes one circuit judge to issue a certificate of appealability. All right. I just don't want to ---- Just address Judge Berzon's question. Okay. Well, in Smith v. Phillips, 455 U.S. 209, 217, the Petitioner is entitled to a jury capable and willing to decide the case based on the evidence before it. And in this particular case, he has not overcome, the Petitioner has not overcome the presumption that the juror would follow the instructions given. It's not even mentioned. I mean, correct? Well, wait a minute. Let's back up to what standard do you think applies here in terms of the juror misconduct or the juror extraneous information? And was that standard followed by the State courts? Well, according to Smith v. Phillips, due process means a jury capable and willing to decide a case solely based on the evidence before it. Okay? Now, with respect to this presumption, first of all, I don't think he's even met the presumption that this juror somehow was influenced by virtue of the comments   of the comments made by the Petitioner. Well, you would agree that she, she, you agree with what, you don't disagree with what she testified to, what she brought to the judge's attention, right? Absolutely. She came in, she took it all. She received extraneous information that had not been presented during the course of the trial. And yes, and then she voluntarily, following her oath, came before the judge and said, hey, something's happened here, and I need to bring it to your attention. And the judge allowed inquiry by both parties. The juror said, it's not, I'm not going to consider it. I'm not going to share it. It will not enter into my deliberations. I don't know, in the second, there were actually two separate hearings with respect to this matter, one beginning at excerpt of the record 896 and continuing on through about page 900, and then again at 946, continuing on through 949. And in both those hearings, the juror assured both the judge and both parties that she would not consider the information, it would not enter into her deliberations, and she would not consider it. And then there was a second hearing with the jury instruction, which informed actually there were, it was, the jurors were informed on two different occasions that they were to consider only the evidence that was presented in the trial. Kagan. And there's a whole background doctrine here which exists in Supreme Court cases and in our cases with regard to the particular question. Smith v. Phillips was not about extraneous information, right? It had to do with juror contact. Yes, but the juror contact was zero. I mean, it was contact, but it was contact that may have led to a conflict, but it was not about extraneous information. Am I right about that? I'll accept that proposition for the purposes of this analysis. It's not helpful to having a discussion to be so resistant to the background existing law. It's helpful to try and deal with what is out there. So as my understanding of what is out there, does set this burden-shifting idea and does say that extraneous information puts a heavy burden on the government to show that there wasn't an impact. Do you disagree with that? No. As a matter of fact, in Caliendo, this Court said the presumption can be rebutted by a strong showing to the contrary by the State. Okay. So that's the world we're in. Do we agree now that that's the world we're in, at least that much? That much. Okay. So if that's the world we're in, I'd like you to tell me why it was rebutted. First of all, I assume you agree that there was a sufficient showing made by the defendant to trigger that presumption. Do you agree with that? I'm not sure that I do, because the presumption arises from the circumstances. All the person did is said, somebody talk to me. Now, the presumption of the prisoner. That's exactly the category of contact that has been said to create this presumption. Assuming that the presumption arose. Okay. The State rebutted it by and the rebutting occurred by virtue of the inquiry and the assurances given by the juror during the course of the continued vore dire by the judge. What Mr. Lambrose and the Petitioner would have this Court assume is that it can never be rebutted at that particular point in time, and it cannot be rebutted by accepting the assurance of the juror. But suppose she had come in and said something much more definite. This woman told me that she saw, you know, Mr. Major do the murder, right? And then they said, well, is that going to influence you? She said, no, I don't believe this woman and it's not going to influence me. Would you say that's fine, let's just go on? I mean, this was a little. As long as the presumption is, is now you're assuming that you can't take the juror's word. You're what Mr. Lambrose is asking you to do, and your question you posed to me presumes  that there are circumstances in which people think they're not being, that essentially that people are not sufficiently self-aware to be able to put out of their mind something that is really, really prejudicial, if you believe it. All right. Well, that's certainly, that evidence certainly does not appear in this particular case. There's certainly no circumstance that would indicate that in this case. The jury, you have a juror who took her oath so seriously, she came forward and said, this is what happened. I mean, you know, what more can you ask of a juror? And as you pointed out, Your Honor, it wasn't, you know, it wasn't the murder weapon, she found a knife. This woman, who she doesn't trust, said she. Well, she said it was the murder weapon, though, I thought. Beg your pardon? I thought she said it was the murder weapon. I thought she said the woman said that it was the. I think she said that the State has the weapon, has a knife, has a knife. We don't know whether it was a murder weapon or not. Nevertheless, with respect to this particular claim, as I pointed out, there is a presumption that jurors follow the jury instructions. Perry v. Johnson, 532 U.S. 782, 789, 2001. Now, given the juror's assurances and what she told the judge following examination by both parties, the Petitioner has not only not shown bias on part of the juror, the Petitioner has not shown, has not overcome the presumption that the juror would follow the instructions that were given to her. I gather in those instructions there was a general instruction about you're admonished to only make your decision based upon the evidence that's been presented. It was essentially that. It was essentially that, but the presumption is still there. And with respect to this action. No, I mean, all the judge does in his – in the instructions at the end of the trial is to give a general admonition to the juror that they're – to make their decision based on what they heard in the courtroom. It was given to them – it was given to the jurors twice, Your Honor. It was jury instruction one, jury instruction 30. And as the Supreme Court tells us, we're supposed to presume that the jurors follow that instruction, correct? That is correct. That's what your point is? That is correct. But if that were true, then the whole line of cases would go up in smoke because people are always instructed on that. And so the fact that there are external contacts would never make a difference. Well, he's – the petitioner's got the burden of showing that there was a due process violation. And the burden that he has to overcome in this particular case is set out in the AEDPA. And whether he agrees or disagrees with the Nevada Supreme Court's analysis, the U.S. Supreme Court has said, so long as the result is not contrary to or unreasonable application of clearly established Federal law, he's denied it. The Nevada Supreme Court discussion is a little fuzzy about whether – what standard it was applying. I beg your pardon? The Nevada Supreme Court opinion is at least a little fuzzy about whether it was applying a presumption or wasn't. Well, I respectfully disagree, Your Honor. They did cite Remner and – But not for that point. They cited it for the point of having a hearing. Well, as I recall, too, the court said the district court's determination is supported by evidence which suggests that the juror did not solicit the information, did not engage in conversation with the coworker, who conveyed the information, did not think the coworker was credible. And then they cite Conforti, the State case, determining whether evidence presented rebuts a presumption of prejudice is a factual determination. So they do talk about whether or not there was a presumption. I would also point out that with respect to this particular matter and the recent Harrington v. Richter decision by the United States Supreme Court, the Petitioner has failed to show that there was no reasonable basis for the Nevada Supreme Court to deny relief on the claim. And given what transpired during the course of the hearing, the fact that this juror came forward, she didn't solicit the information, she didn't engage in a conversation, and as a matter of fact, she said, I can't talk about it with you, and turned around and left, she didn't think the coworker was credible, she assured the court that it would not enter into her deliberation, she would not share it with the jurors, that in conjunction with the repeated admonitions by the district court to consider only the evidence, the Petitioner cannot prevail in this action on the claim. If you have any other questions, I'd be happy to do it. Does BREC apply in this situation? Or do we just use the standard based in Renner, you know? Have you thought about it? I think it would. There would have to be — it's not structural error, so I think it would have to be doubly deferent. There would have to be double deference applied to the Nevada Supreme Court's ruling on this, and assuming that there was error, then you'd have to go to BREC. Thank you. One minute for rebuttal, because we gave you an awful lot of time. I appreciate the minute. Thank you very much. I just want to make very clear, just so I don't see something I would not like to see in an opinion. I didn't mean to concede that there was some kind of burden shifting with regard to this prejudice analysis, Judge Bea. The only burden that the defendant has is the burden to show that it was more than de minimis. We've shown that. That's our position. Then, unless the State can show that there was a reasonable possibility test, there was no reasonable possibility of prejudice, the Petitioner should prevail. I don't think Harrington v. Richter applies to this case. Harrington was a postcard denial case out of the California Supreme Court. There was no analysis done, so the Federal Court had nothing to do. The U.S. Supreme Court basically said, well, Ed Postil applies in those cases. This is not that case. This is a case where you have the highest state court and the trial court identifying the correct standard but applying the wrong test. And that's why, you know, again, the panel in Caliendo did not apply Brecht. They conducted an independent de novo review, and they concluded that the Petitioner in a 2254 post-EDPA case wins. Thank you for the opportunity to reply. The matter is submitted. Thank you, counsel. We appreciate your arguments. And we're going to take a short recess at this time for about 10 minutes.
judges: Paez, Berzon, Bea